# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# CENTRAL DIVISION

———————————————————————————    )
                                )
In re:                          )
                                )
    MICHAEL K. SCHOLD and      )       Chapter 13
    CHRISTINE M. SCHOLD,       )       Case No. 13-40145-HJB
                                )
               Debtors   )
———————————————————————————    )

## MEMORANDUM OF DECISION

Before this Court on remand from the Bankruptcy Appellate Panel for the First Circuit (the "BAP") is the "First and Final Application by Counsel to the Debtors, Philip M. Stone, Esq. for Compensation under 11 U.S.C. § 329(a) and MLBR 2016-1," as subsequently amended (the "First Fee Application"; the "Amended Fee Application"), through which attorney Philip M. Stone ("Attorney Stone"), counsel to the debtors in the underlying Chapter 13 bankruptcy case, seeks allowance of compensation and expenses in the total sum of $56,797.56.  By Order dated December 12, 2014, this Court disallowed a substantial portion of the First Fee Application.  In its Memorandum of Opinion dated May 22, 2015 (the "BAP Memorandum"), the BAP vacated this Court's December 12, 2014 Order and instructed this Court to either apply a lodestar analysis in ruling on the First Fee Application or provide specific reasons why it chose to deviate from that standard in its initial ruling.[1]  This Court has again reviewed the First Fee Application, as well as the Amended Fee Application and the complete record in this case.  The Court

———————————————————————

[1] See In re Schold, BAP No. MW 14-074, 2015 WL 3733649 (B.A.P. 1st Cir. May 22, 2015).

now sets forth more completely the various reasons why it now reaches the same conclusion as it did in its initial determination.

## I.   FACTS AND PRIOR PROCEEDINGS

### A.    The Backstory: The Bankruptcy Case and the Dismissal

On January 24, 2013, Michael K. and Christine M. Schold ("Mr. Schold," "Ms. Schold," and, together, the "Debtors") filed a joint petition under Chapter 13 of the United States Bankruptcy Code.[2] They were at all times represented by Attorney Stone. Coincident with the Debtors' filing of the various required financial schedules and statements, Attorney Stone filed his Disclosure of Compensation of Attorney for Debtors (the "Disclosure of Compensation"), which indicated that he had "agreed to accept" the amount of $10,274.00 (including a $274.00 fee for filing the case).[3]

In the Disclosure of Compensation, Attorney Stone described the services he agreed to provide in exchange for the disclosed fee; those legal services were to include only:

   a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;

   b. Preparation and filing of any petition, schedules, statement of affairs and plan which may be required; [and]

   c. Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof[.]

---

[2] See 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code" or the "Code").  All references to statutory sections are to the Bankruptcy Code unless otherwise specified.  References to the "Bankruptcy Rules" are to the Federal Rules of Bankruptcy Procedure.  And all references to "Local Rules" are to the Local Bankruptcy Rules for the District of Massachusetts United States Bankruptcy Court.

[3]  The recitation of the amount of the filing fee appears to be in error. The filing fee at the time the case was filed was actually $281.00, an amount that is reflected in later pleadings.

Disclosure of Compensation at 1, ECF No. 23, Feb. 25, 2014.  Other services, including "[r]epresentation of the debtors in dischargeability actions, judicial lien avoidances, relief from stay actions," and "negotiations" with secured parties, were expressly excluded.  Id.

The Disclosure of Compensation also referenced an attached "retainer agreement" entered into between Attorney Stone and the Debtors (the "Retainer Agreement"). Although both the Disclosure of Compensation and the Retainer Agreement recite an agreed-upon initial fee of $10,000.00 plus the filing fee, the Debtors were only able to pay Attorney Stone $7,500.00 at the time they executed the Retainer Agreement.[4]

In the Retainer Agreement, legal services were divided into two categories.  The services listed under section I of the Retainer Agreement ("Section I" services) were those covered by the initial $10,000.00 fee and essentially tracked those services described in the Disclosure of Compensation as being covered by the $10,000.00 fee (exclusive of the filing fee). Those matters were described as:

1. General legal advice and assistance concerning debt problems;

2. Legal advice, preparing and filing of required documents including the petition, and the initial schedules, statements, declarations, matrix of creditors and Plan; [and]

3. Legal representation at the meeting of creditors pursuant to Section 341[.]

Retainer Agreement, ECF No. 23.

Section II of the Retainer Agreement described various matters for which an additional hourly billing rate would be imposed (and for which it was possible an additional retainer would be required) (the "Section II" services).  These were set forth as:

1. Adversary proceedings brought by or against the Debtor . . . ;

---

[4] The Debtors subsequently paid the remainder of the $10,000.00 initial fee to Attorney Stone.

2.     Controversy concerning claimed exemptions;

3.     Lien subordination pursuant to Section 506;

4.     Claims reviews, and disputed claims either as to status or amount, including creditors seeking relief from the automatic stay;

5.     Claims of taxing authorities;

6.     Objections to discharge generally or questions as to the dischargeability of a particular debt;

7.     Avoidance of judicial liens;

8.     The sale of, or re-finance secured by, any property of the estate;

9.     The conversion of the case from one chapter of the Bankruptcy Code to another;

10.    Amendments to schedules and/or Plan, either pre or post Confirmation, including all communications and pleadings;

11.    Review of correspondence and pleadings filed by creditors and interested parties;

12.    Responses to 11 U.S.C. §707(b) inquiries;

13.    Attendance at hearings concerning any Section II matter;

14.    "Workouts". The Debtor may request that the Attorney negotiate with one or more creditors either before or during the pendency of a bankruptcy case as part of an effort to either avoid the need to file bankruptcy, or to retain possession of real or personal property.

Id. [multi-sic].[5] The Retainer Agreement further provided for monetary penalties (by way of waiver of full or partial reimbursement) if the Debtors should choose not to file the bankruptcy case or if they chose to seek dismissal of the bankruptcy case after filing.

At the time of Attorney Stone's retention, Mr. Schold informed him that, "in addition to owning rental properties, [Mr. Schold] operated three unincorporated businesses,

---

[5] Some of the Section II matters arise in almost every Chapter 13 case; others arise only sporadically.

which included a real estate development company, a home-building and contracting business, and a trucking company . . . [and that the Scholds were] in the midst of an amicable divorce." Amended Fee Application at 3, ECF No. 188, Dec. 4, 2015. Notwithstanding the ethical dilemmas faced by an attorney asked to represent divorcing clients in a joint bankruptcy case, Attorney Stone plowed ahead.

The case followed somewhat typically for a time, with the Debtors objecting to a few claims with mixed results.  Two unopposed motions for relief from the automatic stay filed by mortgagees were granted, and a third mortgagee agreed to a mortgage loan modification (subsequently approved by the Court). The Chapter 13 trustee proceeded patiently, filing several requests for extensions of time to object to the Debtors' proposed Chapter 13 plan.

Finally, on May 31, 2013, then four months into the case without a confirmed plan, the Chapter 13 trustee filed an objection to confirmation of the plan filed by the Debtors. In the objection, the Chapter 13 trustee complained that, under the proposed Chapter 13 plan, the Debtors were (i) not providing all of their disposable income for the benefit of their creditors as required under 11 U.S.C. § 1325(b)(1)(B) and (ii) proposing to retain a vacation home in Maine on account of which they were incurring a monthly deficit of over $200.00 – moneys which, in the Chapter 13 trustee's view, ought to be devoted to payments for the benefit of all creditors.

Attorney Stone filed no response to the Chapter 13 trustee's objection to confirmation of the Chapter 13 plan.  Accordingly, on June 18, 2013, this Court ordered the Debtors to amend or modify the Chapter 13 plan within 30 days, failing which the case would be dismissed without further notice or hearing. The Debtors requested multiple

extensions of the deadline for amending or modifying the Chapter 13 plan, stating that certain outstanding claims to which the Debtors objected precluded the Debtors from filing a confirmable plan.  Each of those extension requests was granted.

One of the claims which presented an obstacle to confirmation was the claim filed by Arthur and Elizabeth Barbeau (the "Barbeaus").  The Barbeaus had timely filed an adversary proceeding against Mr. Schold, requesting that their claims against him be determined nondischargeable under §§ 523(a)(2) and (6) of the Bankruptcy Code. Prepetition, the Barbeaus had contracted with Mr. Schold to construct a home for the sum of $850,000.00. The Barbeaus contended that Mr. Schold made a variety of misrepresentations to them, including that he was competent to do the job, and that Mr. Schold had used the progress payments made by the Barbeaus to, *inter alia*, pay his subcontractors on other projects.  According to the Barbeaus, the work on their home was substandard and at variance from the terms of the construction contract.  The Barbeaus further maintained that Mr. Schold's representations were fraudulent and his conduct willful and malicious.

Mr. Schold generally denied the Barbeaus' allegations and contended that the Barbeaus stopped making required payments to him prior to completion of the project and denied him access to the property.  In response to the Barbeaus' complaint filed in the adversary proceeding, Mr. Schold counterclaimed, contending that the Barbeaus had breached the construction contract and owed Mr. Schold $70,347.81 for "change orders" made by the Barbeaus during the course of construction. The dispute proceeded apace, with both sides jostling over discovery matters (most of which ought to have never been brought forth or should have been resolved consensually, e.g., where and how to conduct

6

examinations of the Barbeaus).[6]   Mr. Schold also filed motions for judgment on the

pleadings and for summary judgment, neither of which ever had a ghost of a chance of

success and both of which were denied.

On August 27, 2014, the Barbeaus adopted a new tack.  They filed in the Debtors'

main case a "Motion to Dismiss Debtors' Chapter 13 Case for Cause, or in the Alternative

to Convert from Chapter 13 to Chapter 7 for Bad Faith Filing" (the "Motion to Dismiss").

In the motion, the Barbeaus argued that the Debtors' Chapter 13 case should be

dismissed on account of material omissions in the Debtors' schedules and their

Statement of Financial Affairs.  Furthermore, the Barbeaus noted:

> In Debtors' bankruptcy filing, Mr. Schold states that he is self-employed.
> Consequently, he is a "debtor engaged in business" for purposes of the
> Bankruptcy Code.   Section 1304(a) incorporates Section 704(a)(8) to
> require a chapter 13 debtor engaged in business to file "….periodic reports
> and summaries of [the debtor's] business." Section 704(a)(8).   The
> Massachusetts Local Bankruptcy Rules ("MLBR") call for Mr. Schold to file
> with the Standing Trustee "... within thirty (30) days of the close of each
> quarter, a statement of quarterly income and expenses incurred. MLBR 13-
> 2(a)(2)(C).   Debtor's counsel has not responded to Movants' request for
> documentation of Mr. Schold's compliance with the above technical and
> procedural requirement.

Motion to Dismiss at 23-24, ECF No. 129.[7]

---

[6] At one point, when counsel for the parties were unable to agree on the actual fact pattern of how
*their* dispute arose, the Court scheduled an evidentiary hearing at which counsel could each take
the stand, following which the Court would award appropriate monetary sanctions.  That hearing
was avoided when counsel for the parties subsequently filed a joint statement resolving their
existing dispute and promising to cooperate in the future.

[7] 11 U.S.C. § 1304(c) requires a debtor engaged in business to "perform the duties of the trustee
specified in section 704(a)(8)." Section 704(a)(8), in turn, provides in relevant part:

(a)     The trustee shall-
        . . . . .

        (8)     if the business of the debtor is authorized to be operated, file with
                the court, with the United States trustee  . . . periodic reports and
                summaries of the operation of such business including a statement

The Motion to Dismiss was set for hearing on September 17, 2014. On the day before

the hearing (September 16, 2014), Attorney Stone filed an opposition.  With regard to the

quarterly statements required to be filed with the Chapter 13 trustee pursuant to Local

Rule 13-2(a)(2)(C) (the "Quarterly Statements"), and which had not been filed since the

commencement of the case, the Debtors responded:

> Michael Schold admits that he has not filed monthly [sic] operating reports
> with the Chapter 13 Trustee as required. An *Affidavit of Mr. Schold*
> describing his efforts to obtain competent post-petition accounting support
> services is attached here as **Exhibit 5**.   Counsel for the Debtors has
> reminded Mr. Schold of his obligation to file monthly reports with the
> Chapter 13 Trustee, and has discussed the issue with Ms. Pappalardo [the
> Chapter 13 trustee]. The outstanding reports are in the process of being
> prepared by Accounting Solutions in Worcester, and will be submitted
> shortly.

Debtors' Opposition to Motion to Dismiss at 5 ¶ 28, ECF No. 136. In the attached affidavit,

Mr. Schold stated:

> I . . .  am currently working with a new accountant to bring my books up to
> date. My wife and I have been separated for two years and I no longer have
> her help with my day to day books.  This not what I do best so I went to
> Michael Jarominski CPA last year in Webster.  They were not meeting my
> needs.  They fell behind with my books which caused me to have to file for
> an extension for my taxes.  To complicate matters further my laptop was
> stolen during a break in.  After several non-returned phone calls I began
> looking for a new accountant.  I *am working* with the new accountant to
> bring my books up to date.

Id. at Exhibit "5" (emphasis supplied).  Notably, the Debtors never sought approval of any

compensation paid to either Mr. Jarominski or Accounting Solutions, as required by

---

of receipts and disbursements, and such information as the United
States trustee or the court requires[ ] . . . .

Local Rule 13-2(a)(2)(C) also requires a "debtor engaged in business" to "submit to the chapter
13 trustee . . . within thirty (30) days of the close of each quarter, a statement of quarterly income
and expenses incurred."

Bankruptcy Rule 2016(a) and Local Rule 2016-1.

At the hearing on the Motion to Dismiss, Attorney Stone admitted that he was aware that Mr. Schold had never filed the necessary Quarterly Statements with the Chapter 13 trustee, although Attorney Stone said he had urged Mr. Schold to do so.  But Attorney Stone never assisted Mr. Schold in getting the accounting services supposedly necessary to complete the reports.  And at one point during the hearing, Attorney Stone suggested that Mr. Schold's failure to file reports was the fault of the Chapter 13 trustee for failing to insist on their production. In any event, because Mr. Schold had not filed any of the required Quarterly Reports in the twenty months the case had been pending, the Court granted the Motion to Dismiss (the "Dismissal Order").

Attorney Stone then moved to vacate the Dismissal Order (the "Motion to Vacate").[8]  There, he repeated arguments previously made and raised a variety of issues that had little or nothing to do with the reason for this Court's dismissal of the case. Nevertheless, he did attach profit and loss statements for Schold Trucking during the relevant period.  However, the Court was not impressed. First, no financial information was provided with respect to Mr. Schold's other businesses.  Second, Local Rule 13-2 does not call for a debtor engaged in business to file postpetition profit and loss statements.  Rather, it requires that such a debtor file 1) profit and loss statements for periods *prior* to the filing of the Chapter 13 case and 2) thereafter, during the course of the case, quarterly *statements of income and expenses* incurred.  While postpetition profit and loss statements are informative to some degree, statements of income received and expenses incurred are required postpetition, and are more informative as to whether a

---

[8] Properly speaking, the motion was misnamed; it should have been titled a motion for reconsideration or motion for relief from the Dismissal Order under Bankruptcy Rule 9024.

class of unpaid creditors is being created postpetition, leading to future unpaid administrative expenses. And third, the Court found it very curious that Mr. Schold, who claimed not to have been able to state his quarterly income and expenses without the assistance of an accountant, managed to file the far more sophisticated profit and loss statements for the previous twenty months within only nine days after the dismissal of the case, but still failed to file the statements of income and expenses. In any event, the so-called Motion to Vacate was denied. There was no appeal of either the Dismissal Order or the denial of the Motion to Vacate.

## B.   The First Fee Application

Shortly after the dismissal of the case, Attorney Stone filed his First Fee Application, seeking allowance of compensation in the amount of $55,692.00 and reimbursement of $662.56 for expenses.[9] At the hearing on the First Fee Application, held December 12, 2014, the Court opted not to delve into the minutia of the fee application itself. Instead, the Court chose to focus on what the Court felt was the elephant in the room – the fact that the case was dismissed because Attorney Stone had not taken steps to comply with, or at least monitor the Debtors' compliance with, Chapter 13 reporting requirements. As aptly reported by the BAP in its May 22, 2015 Memorandum:

> During the course of the hearing on the Application, the bankruptcy court questioned Mr. Stone regarding the required operating reports, and Stone confirmed that the Scholds had not filed any such reports with the Trustee. The court further inquired whether Stone had instructed the Scholds to

---

[9] At the time the Debtors' case was dismissed, the Chapter 13 trustee was in possession of over $26,000 in Chapter 13 payments from the Debtors, which were required to be remitted directly to the Debtors, pursuant to § 1326(a)(2), absent an order to the contrary from the Court. Such an order did issue, however, when Attorney Stone filed, along with his First Fee Application, a motion asking that the payments held by the Chapter 13 trustee remain in her possession pending a ruling on his fees.

forward copies of the required reports to him for review. Stone responded in the negative, explaining that such review was not his practice. The bankruptcy court suggested that this omission in oversight of his clients may very well constitute malpractice. Shifting attention to the Trustee, the court inquired what procedures she had in place to alert her or her staff to a debtor's failure to submit operating reports when mandated under the Bankruptcy Code. She replied that her office tracked such reports on a quarterly basis, and explained that it was customary within the district for such reports to be submitted directly to her by debtors rather than through their counsel. She also advised the court that it was not her practice to seek dismissal of a case when a debtor fails to file such reports unless a debtor also fails to pay the monthly payments required by a debtor's proposed or confirmed plan.[10]

The court concluded:

> Mr. Stone, in my view, you had an obligation to notify your clients that these reports are required, which you say you did, and I have no evidence that you didn't. But frankly, it doesn't matter. You had an obligation to make sure it was happening.

> You also had an obligation to review them and this notion that the debtor sends these financial materials to the Chapter 13 trustee without having them reviewed by counsel, or at least copying them to counsel is, in my view, gross negligence.

> So for those reasons, I am allowing, somewhat reluctantly, fees and expenses in the amount of $10,000. The balance is disallowed.

Schold, 2015 WL 3733649 at *2.

Attorney Stone's appeal to the BAP followed.  There, he argued that the Court had

failed to properly evaluate the First Fee Application consistent with case law in this Circuit.

The BAP concluded that the record "does not demonstrate that [this Court] applied the

---

[10] Frankly, this Court cannot decide whether it was more stunned by Attorney Stone's view that there was no need for him to review a document prepared by his client before its transmission to an adverse party, the suggestion that such a practice is common among lawyers in this district, or the Chapter 13 trustee's cavalier attitude towards compliance with a long-standing Local Rule promulgated by the Bankruptcy Judges in the District of Massachusetts.  The first was, and is, a subject of this dispute; the second (even if true) is not before the Court; and the Court trusts that the third is a deficit that has since been remedied.

lodestar analysis or deviated from it for specific reasons," id. at *5, and instructed this Court to provide a "detailed explanation" for its conclusions on remand, id. So be it.

### C.    The Amended Fee Application

After remand, the Court undertook to thoroughly review (again) the First Fee Application, considering, as it must, the requirements and application of Local Rule 2016-1. In doing so, the Court identified a variety of infirmities in the First Fee Application which precluded a full lodestar analysis. As the Court was reticent to raise the Local Rule 2016-1 noncompliance issues or to raise other patently obvious concerns with the First Fee Application without affording Attorney Stone with the opportunity to repair any deficiencies, the Court issued an Order identifying several problems with the First Fee Application and providing Attorney Stone an opportunity to rectify them. The Order stated, in relevant part:

a.    The First Fee Application failed to comply, as to the so-called Section I matters (described below) with Local Rule 2016-1(a)(1)(A)-(C);

b.    The First Fee Application failed to comply with Local Rule 2016-1(d)(1) and (2) insofar as Attorney Stone sought more than $ 35,000 in compensation and the application was not divided in project categories with accompanying narratives and a summary chart after each project category as required by those Rules; and

c.    In light of the fact that the first entry of Exhibit 2-A for services rendered on August 24, 2012 read: "Initial TC. Owns unincorporated building business. Is in the midst of amicable divorce . . .," the Application should contain evidence that the Debtors consented to the Attorney Stone's representation of both Debtors as required by 1.7 of the Massachusetts Rules of Professional Conduct.

November 12, 2015 Order, at 2-3, ECF No. 186. The order offered Attorney Stone an opportunity to amend the First Fee Application, which offer he accepted; the Amended Fee Application was filed on December 4, 2015.

II.   <u>DISCUSSION</u>

    **A.**   **The Applicable Legal Standards**

This Court has previously detailed the statutory and case law framework applicable

to the award of counsel fees in Chapter 13 cases:

> The standards for allowance of compensation to professionals generally are set forth in § 330 of the Bankruptcy Code.  11 U.S.C. § 330 (2004).  With respect to Chapter 13 cases, § 330 specifically provides:

>> In a chapter 12 or chapter 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.

> 11 U.S.C. §330(a)(4)(B) (2004).

> And §330 further instructs with respect to compensation under any chapter:

>> In determining the amount of reasonable compensation to be awarded the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –

>> (A) the time spent on such services;

>> (B) the rates charged for such services;

>> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

>> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

>> (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under

this title.

11 U.S.C. §330(a)(3) (2004).

In this Circuit, the methodology employed to evaluate the reasonableness of compensation for professionals is the "lodestar" approach. See Boston and Maine Corp. v. Moore, 776 F.2d 2, 6-7 (1st Cir.1985); Furtado v. Bishop, 635 F.2d 915, 920 (1st Cir.1980); Garb v. Marshall (In re Narragansett Clothing Company), 210 B.R. 493, 497 (1st Cir. BAP 1997); In re Bank of New England Corp., 142 B.R. 584, 586 (D. Mass. 1992); In re Act Manufacturing, 281 B.R. 468, 479 (Bankr. D. Mass. 2002); In re Anolik, 207 B.R. 34, n.11 (Bankr. D. Mass.1997); In re 1095 Commonwealth Ave. Corp., 204 B.R. 284, 290 (Bankr. D. Mass. 1997); In re Smuggler's Beach Properties, Inc., 149 B.R. 740, 743 (Bankr. D. Mass. 1993); In re First Software Corp., 79 B.R. 108, 112-13 (Bankr. D. Mass.1987); In re WHET, Inc., 58 B.R. 278, 285 (Bankr. D. Mass.1986). Courts first develop a point of reference by determining a reasonable billing rate and then multiplying it by the number of hours which appropriate tasks should have consumed. Narragansett Clothing Company, 210 B.R. at 497.

The lodestar rate ought to take into account the type of work performed, who performed it, the expertise that it required, and when it was undertaken. Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 950-51 (1st Cir. 1984). The court must "consider prevailing market rates in determining the lodestar, based on usual and customary rates in the jurisdiction . . . . No presumption exists that a professional is entitled to the amount he or she requests." Narragansett Clothing Company, 210 B.R. at 498-99. Once determined, the applicable rate is multiplied by the hours reported, after those which are duplicative, unproductive, excessive, or otherwise unnecessary are subtracted. Grendel's Den, Inc. v. Larkin, 749 F.2d at 950.

Finally, the lodestar is adjusted by various factors, including: (1) the time and labor required; (2) the novelty and difficulty of the questions presented by the case; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time pressures imposed by the client or the circumstances; (8) the amount involved and results obtained as a result of the attorney's services; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Smuggler's Beach Properties, Inc., 149 B.R. at 743; In re First Software Corporation at 112.

<u>Anolik</u>, 207 B.R. at n.11.

The Court has an independent judicial responsibility to review the fees of professionals, even in the absence of an objection by a party in interest. <u>In re First Software Corporation</u>, 149 B.R. at 111. The burden of proof is on the party requesting a compensation award. <u>Narragansett Clothing Company</u> 210 B.R. at 498. Where no evidence is presented to establish the customary rate, the court must rely "upon its own expertise in judging market rates for professionals in the jurisdiction in which it sits." <u>Id</u>. at 499.

Measuring proper compensation in Chapter 13 cases presents special challenges. Section 330(a)(4)(B) specifically directs the Court's attention to the welfare of the debtor rather than that of the bankruptcy estate. 11 U.S.C. §330(a)(4)(B) (2004). Furthermore, the economics of practice under Chapter 13 is different from those under Chapters 7 or 11. In Chapter 7 cases, counsel to the individual debtor is paid by the debtor, but is likely to be confronted with a finite set of problems (e.g., relating to exemptions and discharge) to be overcome within a rather limited period of time. In Chapter 11 cases, counsel to the debtor in possession may be called upon to perform extensive services, but can be paid from funds of the estate. <u>See</u> <u>Lamie v. United States Trustee</u>, 540 U.S. --- , 124 S. Ct. 1023 (2004); 11 U.S.C. § 1106; §327. But in Chapter 13, while the amount of available funds to pay for services may be small, the debtor's needs may be extensive. Proper representation of a Chapter 13 debtor requires the time and patience to identify the source of the debtor's financial difficulty in order to draft a reorganization plan that best addresses the debtor's problems. Once drafted, the reorganization plan may have to be negotiated with creditors and the Chapter 13 trustee, and may have to be amended, sometimes more than one time. Disputes as to the propriety of the plan's terms may spill out into the courtroom; and, once disputes are resolved, further plan modification may be required in order to achieve confirmation. And after all of that, the debtor may default and require further legal assistance. Plan defaults, as well as defaults in the monthly payment of home mortgages, are commonplace.

The resources available to fund the typical Chapter 13 case come from the Chapter 13 debtor, an individual with a self-evident inability to raise substantial funds. The economics of a Chapter 13 practice therefore require that counsel to the Chapter 13 debtor use appropriate techniques in order to reduce the costs of doing business. The development of a practice with some measure of volume is commonplace; the employment of paralegals to reduce the average billable rate and the introduction of computer technology to reduce work time is often a necessity. *Yet all of the business efficiencies must be fashioned so that they do not interfere with the high quality of legal services which Chapter 13 debtors deserve and the*

*bankruptcy courts expect of all attorneys who practice before them.*

In re LaFrance, 311 B.R. 1, 20-21 (Bankr. D. Mass. 2004) (emphasis supplied).

Although the above was written in 2004, the relevant law has not substantially changed. Fairly recently, in 2012, the First Circuit Court of Appeals again reiterated the standards to be applied in evaluating fee applications in Chapter 13 cases, but also underlined the specialized perspective of the bankruptcy court in making that evaluation. See Berliner v. Pappalardo (In re Sullivan), 674 F.3d 65, 69 (1st Cir. 2012). And the First Circuit clarified that

> [t]here is no requirement that a bankruptcy court, in explaining a fee award, be precise to the point of pedantry. Instead, the explanation need only be sufficiently detailed to allow a reviewing court to ascertain the trial court's thought processes and glean the basis for its award. *See Torres–Rivera,* 524 F.3d at 340 (upholding reduction in fee award where lower court provided a plausible rationale for its decision).

Id. at 71.

## B.    The Amended Fee Application

The Amended Fee Application, like the First Fee Application, continues to suffer from a variety of infirmities. Each, standing alone, may or may not warrant a substantial reduction in fees. However, viewed within the context of this particular case, the deficiencies loom large.

### 1.    *Failure to Fully Comply with Local Rule 2016-1(a)*

Local Rule 2016-1 requires professionals (including debtors' attorneys in Chapter 13 cases) "seeking interim or final compensation for services and reimbursement of expenses" to "file an application for compensation and reimbursement" with the court.

Neither the First Fee Application nor the Amended Fee Application request allowance of the sum of $3,500.00 which has already been transferred from Attorney

Stone's IOLTA account to his business account. In this district, Local Rule 13-7 excuses

a Chapter 13 debtor's attorney from filing the fee application otherwise required by Local

Rule 2016-1 if the attorney's total compensation does not exceed $3,500.00 for pre-

confirmation services and $500.00 for post-confirmation services.  But that rule does not

excuse attorneys requesting fees in excess of those amounts from seeking approval of

the full amount of fees sought.  If Attorney Stone believes that, because of the provisions

of Local Rule 13-7, he need only apply and account for pre-confirmation fees in excess

of $3,500.00, he is mistaken. He must account for, and seek approval of, the full amount.

2.    <em>Misstatement of the "Retainer"</em>

In the Amended Fee Application, Attorney Stone states that he "received a flat fee

of $3,500 to file the pleadings required under chapter 13, including a *First Proposed Plan*,

pursuant to the *Retainer Agreement* with the Debtor." Amended Fee Application at 1 ¶ 2

(emphasis in original).  He then provides the following accounting of funds received from

the Debtors:

The date and amount of retainers received and disbursements to date:

    a. On January 24, 2013, Counsel received $7,500.00 from the Debtors, which was deposited into his IOLTA account.

    b. On February 26, 2013, $3,781 was transferred to Counsel's operating account for *the agreed-upon flat fee of $3,500* and the Court's filing fee of $281.00.

    c. The balance of funds received ($3,719.00) was earmarked for the anticipated litigation with the Barbeaus.

    d. On March 21, 2014, Counsel received an additional $500 from Michael Schold to be applied to the defense costs of the Barbeau adversary, and on May 20, 2014, Counsel received an additional $500 from Mr. Schold.  Both checks were deposited into Counsel's IOLTA account.

17

e.  On September 5, 2014, Counsel received an additional $1,500 from Michael Schold to be applied to deposition expenses associated with the defense of the Barbeau adversary, which was also deposited into Counsel's IOLTA account.

f.  On September 16th, Counsel was advised by his bank that the $1,500 check was returned "NSF"; Counsel was charged a $15.00 bank fee.

g.  On September 19, 2014, Michael Schold delivered a replacement back check in the amount of $1,500, which was deposited into Counsel's IOLTA account.

h.  On September 19, 2014, Counsel disbursed $560.80 to pay McCarthy reporting Services on their invoice #s 143163 and 143175 for the costs of taking the Barbeaus' video depositions.

i.  Counsel is presently holding $5,643.20 in his IOLTA account.

Amended Fee Application at 3 ¶ 4 (emphasis supplied)

The Court does not quarrel with Attorney Stone's disclosure of the total funds he received from the Debtors.  The Disclosure of Compensation and the Retainer Agreement each describe an expected retainer of $10,000.00, net of the filing fee. And Attorney Stone appears to have received no more.  Nevertheless, the description by Attorney Stone of how the money was *originally* intended to be allocated is false.  Neither the Disclosure of Compensation nor the Retainer Agreement make any reference to a "flat fee" or "agreed-upon retainer" of $3,500.00. On the contrary, both documents could not be clearer that Attorney Stone intended that the initial fee for the routine services in this Chapter 13 case – those that Attorney Stone calls Section I Matters – be set at $10,000.00 (three times the norm in this district).  It is unclear why Attorney Stone's description of the Debtors' initial payment was altered in the Amended Fee Application.  Perhaps recognizing that the amount originally designated for the Section I matters was unusually high, Attorney Stone recharacterized the agreement to reflect a lower fee for those

18

services.  Regardless, Attorney Stone had the ethical responsibility to report accurately

in the Amended Fee Application what was originally agreed with the Debtors as initially

reported to the Court.  A post facto recharacterization of the Disclosure of Compensation

and Retainer Agreement – without explanation – does not meet that standard.

3.    *Failure to Fully Comply with Local Rule 2016-1(d)(1)*

Local Rule 2016-1(d)(1) provides:

> All applications which seek more than $35,000.00 in compensation, or are
> otherwise very lengthy, must be divided into narrative sections and must
> utilize the project categories set forth in subsection (2) below.  Each
> narrative section within each project category must represent a task, must
> describe the task and the benefit to the estate, and must identify the work
> done by each professional.  There shall be attached to each narrative
> section a specific description of services performed under such project
> category each day by each person and the time devoted to such services
> on that day by each person.  The end of each narrative section must include
> a summary chart that conforms to the requirements of section (a)(2)(A)-(F)
> of this rule.

The First Fee Application did not comply with Local Rule 2016-1(d)(1).  By its Order of

November 12, 2015, the Court afforded Attorney Stone the opportunity to remedy that

infirmity.  Attorney Stone did so (to some degree) in the Amended Fee Application with

respect to his so-called Section II matters.  But there was no compliance whatsoever with

respect to the substantial services rendered in the Section I matters.  In fact, the Amended

Fee Application states that approval is sought only for those fees incurred for Section II

services performed from February 4, 2013 through September 30, 2014.  While Attorney

Stone attached time records reflecting the work done on Section I matters, he appears to

assume (consistent with this Court's remarks above) that those services are subsumed

in the newly-denominated $3,500.00 "flat fee" for which he appears to believe there is no

need to seek approval.

Attorney Stone's practice is to lump (what he believes are) routine matters into a so-called Section I. With certain limitations not relevant here, Attorney Stone is free to craft his agreement with his clients in any manner he wishes. Yet Attorney Stone's billing practices do not override the Local Rules of this Court. Any fee application made to this Court must comply with Local Rule 2016-1, regardless of how it is "sectioned."  Because the Amended Fee Application seeks more than $35,000.00 in total compensation, Attorney Stone was required to fully comply with Local Rule 2016-1(d)(1) with regard to *all* services performed for the Debtors.  Attorney Stone failed to do so.

4.     *Failure to Fully Comply with this Court's November 12, 2015 Order*

In addition to identifying several areas of non-compliance with the Local Rules, this Court's November 12, 2015 Order also noted a further problem that needed to be addressed:

> In light of the fact that the first entry of Exhibit 2-A for services rendered on August 24, 2012 read: "Initial TC.  Owns unincorporated building business. Is in the midst of amicable divorce . . .," the Application should contain evidence that the Debtors consented to the Attorney Stone's representation of both Debtors as required by 1.7 of the Massachusetts Rules of Professional Conduct.

November 12, 2015 Order, at 2-3.  Rule 1.7 of the Massachusetts Rules of Professional Conduct, as effective during all relevant periods, provided as follows:

RULE 1.7 CONFLICT OF INTEREST: GENERAL RULE

(a)     A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1)     the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2)     each client consents after consultation.

(b)     A lawyer shall not represent a client if the representation of that client

20

may be materially limited by the lawyer's representation to another client . . . ., unless:

(1)     the lawyer reasonably believes the representation will not be adversely affected; and

(2)     the client consents after consultation.  When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Attorney Stone characterizes the Debtors' marital separation as "amicable." If that description was intended to suggest that the separation was immaterial to his representation of both Debtors in the bankruptcy case, three subsequent events belie that view.  First, as reflected in Attorney Stone's time records, the marital status of the parties impacted the case in a variety of ways, including the Debtors' eligibility to file under Chapter 13, the calculation of their exemptions, and Ms. Schold's ability to remain in the marital home.  Second, it should have been obvious from the outset that the risk of nondischargeability arising from Mr. Schold's dispute with the Barbeaus had the potential to render any Chapter 13 plan unconfirmable.  But that risk applied only to Mr. Schold, and Ms. Schold was entitled to independent advice as to whether an individual bankruptcy case might be in her better interest.  And third, the impact on the case resulting from the parties' marital difficulties became conspicuous when Mr. Schold attempted vainly in his Affidavit dated September 15, 2014 to explain why he had not filed his Quarterly Statements with the Chapter 13 trustee:

My wife and I have been separated for two years and I no longer have her help with my day to day books.  This not what I do best . . . .

Perhaps Ms. Schold signed a written consent to any potential conflict arising from Attorney Stone's representation of her husband.  Perhaps the consent was oral, as was

permissible under the provisions of Rule 1.7 at the relevant time.[11]   Perhaps Attorney

Stone advised Ms. Schold about the risks to her of the Barbeau litigation, notwithstanding

the fact that she was not a defendant.   When the Chapter 13 case was dismissed,

perhaps Attorney Stone suggested that she seek to bifurcate the case and stay in Chapter

13 or even seek conversion to Chapter 7.   Perhaps he suggested that Ms. Schold retain

independent advice as to whether either of those options was in her best interest.   The

Court does not have any of these answers – because, notwithstanding its November 12,

2015 Order, Attorney Stone failed to provide it.

5.   *Lodestar and Adjustment Factors*

With respect to the remaining factors employed by various courts under a lodestar

analysis, the Court first finds (employing judicial notice, since no relevant information was

supplied by Attorney Stone) that the $325.00 hourly rate employed by Attorney Stone is

high for a sole practitioner with his ability and experience practicing bankruptcy law in

central Massachusetts, but not outside of the acceptable range.   With regard to the

number of hours spent on the case, Janet Froehlich, Attorney Stone's paralegal, rendered

26.4 hours at an hourly rate of $100.00 on so-called Section II matters, for a total of

$2,640.00.   The Court has no quarrel with Ms. Froehlich's hourly rate, services, or

background in light of her employment history. Attorney Stone says that he personally

spent 164.40 hours on Section II matters.   The Court's impression is that the time spent

by Attorney Stone on both Section I and Section II matters, as described in the Amended

Fee Application, bordered on the excessive (particularly the time spent on the so-called

Section I matters and his vain attempts to obtain a judgment in the Debtors' favor in the

---

[11] The current version of that Rule requires written consent.

Barbeau litigation by employing a motion to dismiss and motion for summary judgment). Nevertheless, the Court is poorly positioned, as it is in most cases, to say *exactly* how much time ought to have been devoted to various aspects of the Debtors' Chapter 13 case.

Few of the other factors typically mentioned in a lodestar adjustment are noticeably present or addressed by Attorney Stone. The issues in the case were not extraordinarily complex or difficult. Even the nature of the Barbeau litigation (a home contractor accused of improperly handling a homeowner's prepetition deposit), although critically important to the parties, is seen in bankruptcy cases with some regularity. There do not appear to have been any unusual time pressures, nor was the case "undesirable" in any way. And if the representation of the Debtors precluded other employment by Attorney Stone, he certainly did not say so.

And then . . . there is the elephant in the room. And that is not the only metaphor available. One could also seek to employ the old saw about the physician who performed a successful operation, except that the patient died. But even that sardonic twist is not here fully applicable. Attorney Stone did not perform a successful operation. Even if he originally told the Debtors about their obligation to file the reports required by Local Rule 13-2(a)(2)(C), Attorney Stone neglected to oversee his clients' compliance with their requirement to file the Quarterly Statements mandated by both the Bankruptcy Code and a Local Rule of this Court of long standing. And he certainly would have known that the Debtors had not filed those Quarterly Statements if he had exercised sound legal judgment by insisting on an opportunity to review those statements before they were submitted to the Chapter 13 trustee.

Where the deficiencies in an attorney's service to a client are substantial, mathematical analysis of time and hourly rate are rendered moot. This Court need not parse through the Amended Fee Application line-by-line in determining that a substantial reduction in the requested fee is warranted here. See In re Little, 484 B.R. 506, 511 (B.A.P. 1st Cir. 2013) ("The court need not follow a rigid prescription when reducing fees; it may either eliminate specific hours or reduce the overall fee award to a reasonable amount."). Given the various infirmities in the Amended Fee Application, the failure to provide evidence of Ms. Schold's consent to Attorney Stone's representation of a conflicted party, and, predominantly, the ultimate dismissal of the Debtors' case for failure to comply with financial reporting requirements, the Court reaffirms its original ruling on the First Fee Application and will again award fees and expenses in the amount of $10,000.00. The balance of the fee request will be denied.

III.    CONCLUSION

As the First Circuit Court of Appeals is fond of saying in conclusion of its opinions, this Court need go no further. Regardless of the time and effort devoted to this case by Attorney Stone, and regardless of the various flaws in the preparation of his fee application under this Court's Local Rules, the bottom line is that the instant case was dismissed because Attorney Stone failed to monitor a critical duty that his clients undertook in filing a case in this district under Chapter 13.

Under these circumstances, it would be inequitable (indeed bizarre) for this Court to award Attorney Stone, on account of fees, funds now held by the Chapter 13 trustee and otherwise payable to the Debtors. As this Court has previously commented:

24

> Clients come to attorneys for a service. Where the service is not provided, or provided poorly, they should not be required to pay for the service, regardless of the validity of the excuse offered.

LaFrance, 311 B.R. at 25.

This Court will not order Attorney Stone to disgorge fees he has already received. He may retain the $5,643.20 in his IOLTA account, the remainder of his original retainer totaling $10,000.00. But he will be awarded nothing further, and the Chapter 13 trustee will be directed to remit the sum that she is holding ($26,439.14) to the Debtors.

An order in conformity with this Memorandum of Decision will issue forthwith.

_____

DATED:  June 30, 2016                          Henry J. Boroff
                                               United States Bankruptcy Judge